**UNITED STATES of America, Appellee,**

v.

**John A. MULHEREN, Jr., Defendant–Appellant.**

**No. 1557, Docket 90–1691.**

United States Court of Appeals, Second Circuit.

Argued May 20, 1991.

Decided July 10, 1991.

Andrew L. Frey, Washington, D.C. (Wendy E. Ackerman, Mayer, Brown & Platt, Washington, D.C., and Thomas P. Puccio, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for defendant-appellant.

E. Scott Gilbert, Asst. U.S. Atty. (Roger S. Hayes, Acting U.S. Atty., S.D.N.Y., Daniel C. Richman, of counsel), for appellee.

Before VAN GRAAFEILAND, MESKILL and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

In the late 1980's a wide prosecutorial net was cast upon Wall Street. Along with the usual flotsam and jetsam, the government's catch included some of Wall Street's biggest, brightest, and now infamous—Ivan Boesky, Dennis Levine, Michael Milken, Robert Freeman, Martin Siegel, Boyd L. Jeffries, and Paul A. Bilzerian—each of whom either pleaded guilty to or was convicted of crimes involving illicit trading scandals. Also caught in the government's net was defendant-appellant John A. Mulheren, Jr., the chief trader at and general partner of Jamie Securities Co. ("Jamie"), a registered broker-dealer.

Mulheren was charged in a 42-count indictment handed-up on June 13, 1989. The indictment alleged that he conspired to and did manipulate the price on the New York Stock Exchange (the "NYSE") of the common stock of Gulf & Western Industries, Inc. ("G & W" or the "company") in violation of 18 U.S.C. § 371, 15 U.S.C. § 78j(b) & 78ff and 18 U.S.C. § 2, by purchasing 75,000 shares of G & W common stock on October 17, 1985 for the purpose of raising the price thereof to $45 per share (Counts One through Four); that he engaged in "stock parking" transactions to assist the Seemala Corporation, a registered broker-dealer controlled by Boesky, in evading tax and other regulatory requirements in violation of 15 U.S.C. §§ 78j(b) & 78ff and 18 U.S.C. § 2 (Counts Five through Twenty-Four); that he committed mail fraud in connection with the stock parking transactions in violation of 18 U.S.C. §§ 1341 & 2 (Counts Twenty-Five through Thirty-Nine); and that Mulheren caused Jamie to make and keep false books and records in violation of 15 U.S.C. § 78ff & 78q(a) (Counts Forty through Forty-Two).

Count Forty-One was dismissed before trial on the government's motion. At the conclusion of the government's case, the district court dismissed Counts Twenty-Nine through Thirty-Nine pursuant to Fed. R.Crim.P. 29. Of the remaining thirty counts, the jury returned a partial verdict of guilty on Counts One through Four. A mistrial was declared by the district court when the jury could not reach a verdict on the other twenty-six counts. On Counts One through Four, Mulheren was sentenced to concurrent terms of one year and one day imprisonment, a $1,681,700 fine and a $200 special assessment.

This appeal thus focuses solely on the convictions concerning Mulheren's alleged manipulation of G & W common stock. The government sought to prove that on October 17, 1985, Mulheren purchased 75,000 shares of G & W common stock with the purpose and intent of driving the price of that stock to $45 per share. This, the government claimed, was a favor to Boesky, who wanted to sell his enormous block of G & W common stock back to the company at that price. Mulheren assails the convictions on several grounds.

First, Mulheren claims that the government failed to prove beyond a reasonable doubt that when he purchased the 75,000 shares of G & W common stock on October 17, 1985, he did it for the sole purpose of raising the price at which it traded on the NYSE, rather than for his own investment purposes. Second, Mulheren argues that even if his sole intent had been to raise the price of G & W stock, that would not have been a crime because, he claims, (1) he neither misrepresented any fact nor failed to disclose any fact that he was under a duty to disclose concerning his G & W purchases; (2) his subjective intent in purchasing G & W stock is not "material"; and (3) he did not act for the purpose of deceiving others. Finally, Mulheren cites various alleged evidentiary and sentencing errors that he believes entitle him to either a new trial or resentencing.

Although we harbor doubt about the government's theory of prosecution, we reverse on Mulheren's first stated ground because we are convinced that no rational trier of fact could have found the elements of the crimes charged here beyond a reasonable doubt.

## BACKGROUND

Reviewing the evidence "in the light most favorable to the government, and construing all permissible inferences in its favor," *United States v. Puzzo*, 928 F.2d 1356, 1357 (2d Cir.1991) (citing *United States v. Diaz*, 878 F.2d 608, 610 (2d Cir.), *cert. denied* — U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989)), the following facts were established at trial.

In 1985, at the suggestion of his long-time friend, Carl Icahn, a prominent arbitrageur and corporate raider, Ivan Boesky directed his companies to buy G & W stock, a security that both Icahn and Boesky believed to be "significantly undervalued." Between April and October 1985, Boesky's companies accumulated 3.4 million shares representing approximately 4.9 percent of the outstanding G & W shares. According to Boesky, Icahn also had a "position of magnitude."

On September 5, 1985, Boesky and Icahn met with Martin Davis, the chairman of G & W. At the meeting, Boesky expressed his interest in taking control of G & W through a leveraged buyout or, failing that, by increasing his position in G & W stock and securing seats on the G & W board of directors. Boesky told Davis that he held 4.9 percent of G & W's outstanding shares. Davis said he was not interested in Boesky's proposal, and he remained adamant in subsequent telephone calls and at a later meeting on October 1, 1985.

At the October 1, 1985 meeting, which Icahn also attended, Boesky added a new string to his bow: if Davis continued to reject Boesky's attempts at control, then G & W should buy-out his position at $45 per share. At that time, G & W was, indeed, reducing the number of its outstanding shares through a repurchase program, but, the stock was trading below $45 per share. Davis stated that, although he would consider buying Boesky's shares, he could not immediately agree to a price. Icahn, for his part, indicated that he was not yet sure whether he would sell his G & W stock.

During—and for sometime before—these negotiations, Mulheren and Boesky also maintained a relationship of confidence and trust. The two had often shared market information and given each other trading tips. At some point during the April–October period when Boesky was acquiring G & W stock, Mulheren asked Boesky what he thought of G & W and whether Icahn held a position in the stock. Boesky responded that he "thought well" of G & W stock and that he thought Icahn did indeed own G & W stock. Although Boesky told Mulheren that G & W stock was "a good purchase and worth owning," Boesky never told Mulheren about his meetings or telephone conversations with Davis because he considered the matter "very confidential." Speculation in the press, however, was abound. Reports in the August 19, 1985 issue of *Business Week* and the September 27, 1985 issue of the *Wall Street Journal* indicated that Boesky and Icahn each owned close to five percent of G & W and discussed the likelihood of a take-over of the company. Mulheren, however, testify-

ing in his own behalf, denied reading these reports and denied knowing whether Boesky and Icahn held positions in G & W.

On October 3, 1985, two days after his meeting with Boesky and Icahn, Davis met with Mulheren. Mulheren stated that he had a group of investors interested in knowing whether G & W would join them in acquiring CBS. According to Davis, Mulheren also volunteered that he could be "very helpful in monitoring the activities of Ivan Boesky [in G & W stock;] [Mulheren] knew that [Davis] considered Mr. Boesky adversarial;" and Mulheren agreed with Davis' unflattering assessment of Boesky. In a telephone conversation sometime between this October 3 meeting and a subsequent meeting between the two on October 9, 1985, Mulheren told Davis that he believed that Boesky did not own any G & W securities. Mulheren also said that he did not own any G & W stock either. When Davis and Mulheren met again on October 9, they spoke only about Mulheren's CBS proposal.

In the meantime, Boesky continued to press Davis to accept his proposals to secure control of G & W. When Boesky called Davis after their October 1, 1985 meeting, Davis "told [Boesky] as clearly as [he] could again that [G & W] had no interest whatsoever in doing anything with [Boesky]." Boesky then decided to contact his representative at Goldman, Sachs & Co. to arrange the sale of his massive block of stock to G & W. Boesky advised Goldman, Sachs that G & W common stock was not trading at $45 per share at the time, "but that should it become 45," he wanted to sell. A Goldman, Sachs representative met with Davis shortly thereafter regarding the company's repurchase of Boesky's G & W shares.

Sometime after the close of the market on October 16, 1985, Boesky called Davis, offering to sell his block of shares back to

G & W at $45 per share. NYSE trading had closed that day at $44¾ per share, although at one point during that day it had reached $45. Davis told Boesky that the company would buy his shares back, but only at the "last sale"—the price at which the stock traded on the NYSE at the time of the sale—and that Boesky should have his Goldman, Sachs representative contact Kidder Peabody & Co. to arrange the transaction.[1]

After this conversation with Davis, but before 11:00 a.m. on October 17, 1985, Boesky called Mulheren. According to Boesky's testimony, the following, critical exchange took place:

BOESKY: Mr. Mulheren asked me if I liked the stock on that particular day, and I said yes, I still liked it. At the time it was trading at 44¾. I said I liked it; however, I would not pay more than 45 for it and it would be great if it traded at 45. The design for the comment—

DEFENSE COUNSEL MR. PUCCIO: Objection to the "design of the comment." I would ask ask only for the conversation.

A.U.S.A. GILBERT: What if anything did he say to you?

BOESKY: I understand.

Shortly after 11:00 a.m. on October 17, 1985, Jamie (Mulheren's company) placed an order with Oliver Ihasz, a floor broker, to purchase 50,000 shares of G & W at the market price. Trading in G & W had been sluggish that morning (only 32,200 shares had traded between 9:30 a.m. and 11:03 a.m.), and the market price was holding steady at $44¾, the price at which it had closed the day before. At 11:04 a.m., Ihasz purchased 16,100 shares at $44¾ per share. Unable to fill the entire 50,000 share order at $44¾, Ihasz purchased the remaining 33,900 shares between 11:05 a.m. and 11:08 a.m. at $44⅞ per share.

---

1. Around the same time, Mulheren received a call from a broker at another firm who had failed to execute an order that day to buy 25,000 shares of G & W for an institutional customer. The broker asked Mulheren if Mulheren would sell him the 25,000 shares he needed. Mulheren, who, at the time, did not own any shares of

G & W, checked the stock, noted "it was up a dollar that day" and agreed to "short" the broker—sell what he did not own—25,000 shares. Obviously, Mulheren would soon be obligated to cover his short position, i.e. buy 25,000 shares of G & W.

At 11:09 a.m., Ihasz received another order from Jamie; this time, to purchase 25,000 shares of G & W for no more than $45 per share. After attempting to execute the trade at $44⅞, Ihasz executed the additional 25,000 share purchase at $45 per share at 11:10 a.m. In sum, between 11:04 a.m. and 11:10 a.m., Jamie purchased a total of 75,000 shares of G & W common stock, causing the price at which it traded per share to rise from $44¾ to $45. At 11:17 a.m., Boesky and Icahn sold their G & W stock—6,715,700 shares between them—back to the company at $45 per share. Trading in G & W closed on the NYSE on October 17, 1985 at $43⅝ per share. At the end of the day, Jamie's trading in G & W common stock at Mulheren's direction had caused it to lose $64,406.

## DISCUSSION

■■■ A convicted defendant, of course, bears "a very heavy burden" to demonstrate that the evidence at trial was insufficient to prove his guilt beyond a reasonable doubt. *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983). "A jury's verdict will be sustained if there is *substantial evidence*, taking the view most favorable to the government, to support it." *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir.) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987) (emphasis added). Where " '*any* rational trier of fact could have found the essential elements of the crime,' the conviction must stand." *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original).

■■■ On this appeal, however, we are reminded that "in America we still respect the dignity of the individual, and [a defendant] ... is not to be imprisoned except on definite proof of a specific crime." *United States v. Bufalino*, 285 F.2d 408, 420 (2d Cir.1960) (Clark, J., concurring). To that end, it is "imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court 'must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference.' " *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) (quoting *United States v. Kwitek*, 467 F.2d 1222, 1226 (7th Cir.), *cert. denied*, 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972)), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

The government's theory of prosecution in this case is straightforward. In its view, when an investor, who is neither a fiduciary nor an insider, engages in securities transactions in the open market with the sole intent to affect the price of the security, the transaction is manipulative and violates Rule 10b–5.[2] Unlawful manipulation occurs, the argument goes, even though the investor has not acted for the "purpose of inducing the purchase or sale of such security by others," an element the government would have had to prove had it chosen to proceed under the manipulation statute, § 9(a)(2). 15 U.S.C. § 78i(a)(2). Mulheren was not charged with violating § 9(a)(2). When the transaction is effected for an investment purpose, the theory continues, there is no manipulation, even if an increase or diminution in price was a foreseeable consequence of the investment.

Although we have misgivings about the government's view of the law, we will assume, without deciding on this appeal, that an investor may lawfully be convicted under Rule 10b–5 where the purpose of his transaction is solely to affect the price of a security. The issue then becomes one of Mulheren's subjective intent. The government was obligated to prove beyond a rea-

---

**2.** The government also appears to argue in the alternative that the violation occurs not by simply engaging in a securities transaction with the intent to affect the price of a security, but rather by failing to disclose that subjective intent to the market. The government contends that all investors are under a "general duty" not to manipulate; thus, absent disclosure of an intent to manipulate, Rule 10b–5 is violated. We express no view on this theory.

sonable doubt that when Mulheren purchased 75,000 shares of G & W common stock on October 17, 1985, he did it with the intent to raise its price, rather than with the intent to invest. We conclude that the government failed to carry this burden.

In order to convict, the government had to demonstrate, in the first place, that Mulheren was aware that Boesky had a stake in G & W. In proof of knowledge, the government makes three arguments.

First, the government suggests that Boesky himself told Mulheren of his G & W positions. Boesky, however, never so testified; and the greatest puzzle in this record is why that critical question was never directly put to Boesky.[3]

Second, the government relies on the speculation reported in the media, specifically the *Wall Street Journal* and *Business Week*, and the rumors floating on Wall Street that Boesky and Icahn owned substantial positions in G & W. There was no evidence, however, that Mulheren read these articles or heard these rumors. On the contrary, Mulheren flatly denied knowing of their existence. Moreover, knowledge of a rumor, particularly one on Wall Street, can hardly substitute for knowledge of a fact.

Third, the government contends that Mulheren's knowledge of Boesky's position is evident in the October 3, 1985 meeting between Davis and Mulheren. In that meeting, Mulheren told Davis that he knew that Davis and Boesky had an "adversarial" relationship and Mulheren "understood" Davis' "position" and offered to help Davis "in any way he could" to "monitor" Boesky's G & W transactions. While this evidence, taken in isolation, might create an inference that Mulheren knew of Boesky's G & W holdings (as the source of the Boesky–Davis adversarial relationship), the rest of Davis' testimony casts a considerable shadow on the inference. Davis went on to testify that in a telephone con-

versation sometime between their October 3 and October 9 meetings Mulheren stated that he did not believe Boesky owned any G & W stock at all. By this time, of course, Boesky had already told Davis (at their September 5 meeting) that he owned 4.9 percent of G & W's outstanding shares. Given that Mulheren was at the time attempting to curry favor from Davis in connection with Mulheren's CBS proposal, it was hardly in Mulheren's best interest to lie to Davis by telling him that Boesky owned *no* shares, if in fact Mulheren knew that Boesky owned 3.4 million shares. In sum, the evidence of Mulheren's knowledge that Boesky had an interest in G & W rests on a very slender reed.

■ Even were we to conclude otherwise, however, the convictions still could not be sustained. Assuming that Mulheren knew that Boesky held a substantial position in G & W stock, the government nevertheless failed to prove that Mulheren agreed to and then purchased the 75,000 shares for the sole purpose of raising the price at which G & W common stock traded.

The strongest evidence supporting an inference that Mulheren harbored a manipulative intent, is the telephone conversation between Boesky and Mulheren that occurred either late in the day on October 16 or before 11:00 a.m. on October 17, 1985. In discussing the virtues of G & W stock, Boesky told Mulheren that he "would not pay more than 45 for it and it would be great if it traded at 45." To this Mulheren replied "I understand." The meaning of this cryptic conversation is, at best, ambiguous, and we reject the government's contention that this conversation *"clearly* conveyed Boesky's request that the price of the stock be pushed up to $45 ... [and Mulheren's] agreement to help." Boesky

---

**3.** The closest Boesky came to testifying that he told Mulheren about his G & W holdings is the following exchange on direct examination concerning a telephone conversation between Mulheren and Boesky sometime in the period between April and the end of September 1985:

A.U.S.A. GILBERT: What in fact did you tell [Mulheren] about the stock?
BOESKY: As my position was being accumulated, I told him that's how I felt about it, that it was a good purchase and worth owning.

never testified (again, he was not asked) what he meant by his words.[4]

We acknowledge that, construed as an innocent tip—*i.e.* G & W would be a "great" buy at a price of $45 or below—the conversation appears contradictory. It seems inconsistent for Boesky to advise, on one hand, that he would not pay more than $45, yet on the other to exclaim that it would be a bargain ("great") at $45. The conversation does not make any more sense, however, if construed as a request for illicit manipulation. That Boesky put a limit on the price he would pay for the stock ("I would not pay more than 45 for it") seems inconsistent with a request to drive up the price of the stock. If a conspiracy to manipulate for his own selfish benefit had been Boesky's intent, and if Davis were poised to repurchase the shares at the "last sale," Boesky would obviously have preferred to see Mulheren drive the trading in G & W stock to a price above $45. In this regard, it is noteworthy that there was *no* evidence whatever that Mulheren knew of Boesky's demand to get $45 per share from G & W. Moreover, during the four to six weeks preceding this conversation, Mulheren repeatedly asked Boesky what he thought of G & W—evincing Mulheren's predisposition (and Boesky's knowledge thereof) to invest in the company. In fact, Mulheren took a position in G & W when he shorted a broker 25,000 shares of G & W after the market closed on October 16.

Clearly, this case would be much less troubling had Boesky said "I want you to bring it up to 45" or, perhaps, even, "I'd like to see it trading at 45." But to hang a conviction on the threadbare phrase "it would be great if it traded at 45," particularly when the government does not suggest that the words were some sort of sinister code, defies reason and a sense of fair play. Any doubt about this is dispelled by the remaining evidence at trial.

■ First, and perhaps most telling, is that Jamie *lost* over $64,000 on Mulheren's

October 17th transactions. This is hardly the result a market manipulator seeks to achieve. One of the hallmarks of manipulation is some profit or personal gain inuring to the alleged manipulator. *See, e.g.,* *Baum v. Phillips, Appel & Walden, Inc.,* 648 F.Supp. 1518, 1531 (S.D.N.Y.1986), *aff'd per curiam,* 867 F.2d 776 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 114, 107 L.Ed.2d 75 (1989); *Walck v. American Stock Exchange, Inc.,* 565 F.Supp. 1051, 1065–66 (E.D.Pa.1981), *aff'd,* 687 F.2d 778 (3rd Cir.1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *SEC v. Commonwealth Chemical Securities, Inc.,* 410 F.Supp. 1002, 1013 (S.D.N.Y. 1976), *aff'd in part, modified on other grounds,* 574 F.2d 90 (2d Cir.1978).

Second, the unrebutted trial testimony of the G & W specialist demonstrated that if raising the price of G & W to $45 per share was Mulheren's sole intent, Mulheren purchased significantly more shares (and put Jamie in a position of greater risk) than necessary to achieve the result. The G & W specialist testified that at the time Jamie placed its second order, 5,000 shares would "definitely" have raised the trading price from $44⅞ to $45 per share. Yet, Jamie bought 25,000 shares.

Although there was no evidence that Mulheren received a *quid pro quo* from Boesky for buying G & W stock, the government, nevertheless, claims that Mulheren had a "strong pecuniary interest" in accommodating Boesky in order to maintain the close and mutually profitable relationship they enjoyed. With this argument the government is hoist with its own petard. Precisely because of this past profitable relationship, the more reasonable conclusion is that Mulheren understood Boesky's comment as another tip—this time to buy G & W stock. Indeed, there was no evidence that Boesky had ever asked Mulheren to rig the price of a stock in the past.

None of the traditional badges of manipulation are present in this case. Mulheren conspicuously purchased the shares for Ja-

---

**4.** Defense counsel objected after Boesky testified "[t]he design of the comment...." No ruling was made on the objection and the govern-

ment—for reasons known only to itself—abandoned further inquiry into Boesky's state of mind.

mie's account in the open market. *Compare United States v. Scop*, 846 F.2d 135, 137 (matched orders through fictitious nominees), *modified on other grounds*, 856 F.2d 5 (2d Cir.1988); *United States v. Gilbert*, 668 F.2d 94, 95 (2d Cir.1981) (matched orders and wash sales) [5], *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *United States v. Minuse*, 114 F.2d 36, 38 (2d Cir.1940) (fictitious accounts, matched orders, wash sales, dissemination of false literature). The government argues that Mulheren's deceptive intent can be inferred from the fact that (1) he purchased the G & W shares through Ihasz, a floor broker whom the government claims was used only infrequently by Jamie; and (2) Ihasz never informed anyone that the purchases were made for Jamie. These arguments are factually flawed.

There was no evidence that there was anything unusual about Ihasz's execution of the trades. Oliver Ihasz testified that Jamie was a customer of his company. There was no testimony that his company was used infrequently, or that Mulheren's request was in any way out of the ordinary. Nor is there anything peculiar about the fact that Ihasz disclosed only the name of the clearing broker and not Jamie, as the purchaser, when he executed the trade. As Ihasz testified, in an open market transaction, the only information the floor broker provides to the seller is the name of the clearing broker, not the ultimate buyer. Jamie was conspicuously identified as the ultimate buyer of the G & W securities on Ihasz's order tickets, where it is supposed to appear.

■ The government also argues that manipulative intent can be inferred from the fact that Mulheren's purchase on October 17, 1985 comprised 70 percent of the trading in G & W common stock during the period between the opening of the market and 11:10 a.m. Such market domination, the government contends, is indicative of manipulation. While we agree, as a general proposition, that market domination is a factor that supports a manipulation charge, the extent to which an investor controls or dominates the market at any given period of time cannot be viewed in a vacuum. For example, if only ten shares of a stock are bought or sold in a given hour and only by one investor, that investor has created 100 percent of the activity in that stock in that hour. This alone, however, does not make the investor a manipulator. The percent of domination must be viewed in light of the time period involved and other indicia of manipulation. Taken in this context, the cases upon which the government relies, *United States v. Gilbert*, 668 F.2d 94 (2d Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *United States v. Stein*, 456 F.2d 844 (2d Cir.), *cert. denied*, 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972); *In re Delafield & Delafield*, [1967–69 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 77, 648 (SEC 1969), are readily distinguishable.

*Gilbert*, for example, involved the manipulation of the shares of Conrac Corporation where, over a *one-year period*, the defendant's trading constituted more than 50 percent of the overall trading. *See United States v. Gilbert*, [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98, 244, at 91,602, 91,605, 1981 WL 1662 (S.D.N.Y. 1981), *aff'd*, 668 F.2d at 95. In *Stein*, the manipulator's transactions accounted for 28.8 percent of the daily exchange volume of transactions in Buckeye Corporation stock over a *four month period*. *See Stein*, 456 F.2d at 846. When domination is sustained over such an extended period of time, evidence of manipulation is strong. But, if the percentage of control be measured in terms of minutes or hours, anyone could find himself labeled as a manipulator.

*In re Delafield & Delafield* is the only case that gives us pause. There, the respondents entered into a consent decree with the Securities and Exchange Commission concerning allegations that they had

---

**5.** In a wash sale transaction, beneficial ownership of the stock does not change. A matched order involves the prearranged purchase and sale, usually through different brokers, of the same amount of securities at substantially the same price and time. Both practices give the appearance of legitimate market activity.

manipulated the Class A common stock of the Mary Carter Paint Company by selling 17,600 shares of the stock between 2:00 p.m. and the close of the market on January 9, 1968. Respondents' transactions represented 83 percent of the transactions in the stock during that period. Significantly, however, the sales "were effected in the name of two foreign banks to conceal the identity" of the true seller. *See In re Delafield & Delafield*, ¶ 77,648 at 83,400. No such chicanery exists here. Thus, in the absence of other indicia of manipulation—and there are none—the fact that Mulheren dominated the market between 9:30 a.m. and 11:10 a.m. on October 17, 1985 (noting that Mulheren's purchases represented a small fraction of the total October 17th activity in G & W stock) carries little weight.

The government also urges that Mulheren's manipulative intent—as opposed to investment intent—can be inferred from certain of Mulheren's actions after his purchase of the G & W shares. For example, Mulheren sold G & W call options in the afternoon of October 17, 1985 that were designed to create a hedge in the event of a drop in the price of stock. Had Mulheren known, however, that Boesky and Icahn were going to unload 6.7 million shares of G & W stock—which had the inevitable effect of driving the price down—surely Mulheren would have had the foresight to write the options *before* Boesky and Icahn had a chance to sell. That Mulheren wrote the options in the afternoon suggests only that he was attempting to mitigate his losses.

Finally, the government contends that the fact that Mulheren continued to do favors for Boesky after G & W repurchased Boesky and Icahn's shares is inconsistent with his claim that he was "duped" by Boesky into purchasing the 75,000 G & W shares. We disagree. First, the evidence of "favors" rests largely on the unproven "stock parking" charges. Second, Mulheren's conduct after his G & W purchases is equally consistent with that of a sophisticated businessman who turns the other cheek after being slapped by the hand that usually feeds him.

We acknowledge that this case treads dangerously close to the line between legitimate inference and impermissible speculation. We are persuaded, however, that to come to the conclusion it did, "the jury must have engaged in false surmise and rank speculation." *United States v. Wiley*, 846 F.2d 150, 155 (2d Cir.1988) (citing *United States v. Starr*, 816 F.2d 94, 99 (2d Cir.1987)). At best, Mulheren's convictions are based on evidence that is "at least as consistent with innocence as with guilt," *United States v. Mankani*, 738 F.2d 538, 547 (2d Cir.1984), and "on inferences no more valid than others equally supported by reason and experience." *United States v. Bufalino*, 285 F.2d 408, 419 (2d Cir. 1960). Accordingly, the judgments of conviction are reversed and Counts One through Four of the indictment are dismissed.