Michael J. **MARKOWSKI** and Joseph F. Riccio, Petitioners,

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 00–1480.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 2001.

Decided Dec. 21, 2001.

526

William VanDercreek argued the cause and filed the briefs for petitioners.

Susan S. McDonald, Senior Litigation Counsel, Securities & Exchange Commission, argued the cause for respondent. With her on the brief were David M. Becker, General Counsel, Meyer Eisenberg, Deputy General Counsel, Jacob H. Stillman, Solicitor, and Susan K. Straus, Attorney.

Before: RANDOLPH and GARLAND, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

Petitioners Michael J. Markowski and Joseph F. Riccio seek review of a Securities and Exchange Commission order sustaining a disciplinary action taken by the National Association of Securities Dealers ("NASD"). The order imposed liability under Rule 10b–5 for manipulating the stock market and under certain NASD Conduct Rules for causing the publication of "non-bona fide" bid quotations. The SEC also found against Markowski but not Riccio for violations of a restriction agreement governing his firm's inventory holdings and for failure to cooperate with an NASD investigation. *In re Markowski*, Exchange Act Release No. 43,259 (SEC Decision Sept. 7, 2000) ("SEC Decision"). We affirm the Commission's order.

\* \* \*

Markowski was the chairman, CEO, and majority shareholder of Global America, Inc., then an NASD-member firm that specialized in emerging growth companies. Riccio was Global's trader. In June 1990 Global underwrote an initial public offering of Mountaintop Corporation, an Alaskan vodka producer. The Mountaintop securities included common stock, warrants and "units" (each of which could be exchanged for two shares of common stock and two warrants). Because the SEC does not rest its conclusions on data as to quantities involved, the relationships among these securities need not detain us. In "aftermarket" trading (i.e., after the IPO), Global dominated the market for Mountaintop securities, accounting for an overwhelming majority of both purchase and sale volume.

From the IPO in June 1990 until Global's closing in January 1991, Global supported the price of Mountaintop securities. The SEC said that this support took two forms: Global (1) maintained high bid prices for Mountaintop securities, and (2) absorbed all unwanted securities into inventory, thereby preventing sales from depressing market prices. *In re Markowski*, Exchange Act Release No. 43,503, at 2 (SEC Decision Nov. 1, 2000) ("SEC Denial of Reconsideration"). In the end these efforts proved unsustainable. Global closed its doors in January 1991, and Mountaintop's price dropped precipitously—about 75% in one day. *Id.*

In July 1998 the NASD's National Adjudicatory Council ("NAC") held Markowski and Riccio in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, and NASD Conduct Rules 2110, 2120, 3310 for their activities in Mountaintop. Specifically, the NAC found that Markowski and Riccio had engaged in manipulative, deceptive, and fraudulent conduct, and had published non-bona fide quotations. The NAC also found that Markowski had violated the terms of Global's Restriction Agreement and had refused to submit to an NASD investigative interview.

By way of remedy, the NAC ordered that Markowski and Riccio be censured and barred in all capacities from association with any member of the NASD, and that they be fined $300,000 and $250,000, respectively. See Final Order of the National Adjudicatory Council, NASD Regulation, Inc., No. CMS920091, at 1–2 (July 13, 1998).

On appeal, the SEC sustained the NAC's findings and sanctions. SEC Decision at 1. The SEC later denied petitioners' motion for reconsideration. SEC De-

nial of Reconsideration at 3. Markowski and Riccio now seek review.

\* \* \*

We note at the outset that the charge of publishing nonbona fide quotations flowed fairly ineluctably from the finding of manipulation: Rule 3310 bars publishing, or causing to be published, reports of a transaction as a purchase or sale of securities unless the NASD member believes that "such transaction was a bona fide purchase or sale"; an interpretation of Rule 3310 by the NASD Board of Governors, IM–3310, reads the rule as embracing the case of a member who causes a quotation to be published "without having reasonable cause to believe that such quotation ... is not published for any fraudulent, deceptive or manipulative purpose." If the finding of manipulation is supportable, then the second violation follows handily.

Petitioners first seem to argue that because Global's bids and trades in this case were "real"—they involved real customers, real transactions, and real money—the trades cannot be classified as an unlawful manipulation. Indeed, Global's activities were unlike classic schemes using fraudulent devices such as "wash sales" or "matched sales" in which the targeted securities are "traded" back to the sellers themselves or among known parties to give a false appearance of sales and market interest. See, e.g., *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 109 (2d Cir.1998); see also Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 1045–46 (4th ed. 2001) (describing the typical manipulative scheme). On the basis of this distinction, petitioners argue—rather summarily—that their conduct must have been lawful.

Liability for manipulation wholly independent of fictitious transactions in fact raises interesting questions. Without such transactions, the core of the offense can be obscure. It may be hard to separate a "manipulative" investor from one who is simply over–enthusiastic, a true believer in the object of investment. Both may amass huge inventories and place high bids, even though there are scant objective data supporting the implicit estimate of the stock's value. Legality would thus depend entirely on whether the investor's intent was "an investment purpose" or "solely to affect the price of [the] security." *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir.1991). Given the typical ambiguity of intent, commentators have suggested that imposing liability may chill investors from transactions that actually contribute to the efficiency of securities markets. Daniel R. Fischel & David J. Ross, "Should the Law Prohibit 'Manipulation' in Financial Markets?," 105 Harv. L. Rev. 503, 523 (1991) (expressing concerns about the manipulation doctrine's over–deterrence effects); see also *Mulheren*, 938 F.2d at 368 (expressing misgivings about basing 10b–5 violations purely on whether or not a "transaction is effected for an investment purpose").

Commentators have also suggested that where manipulative behavior is solely defined in terms of the actor's purpose, it may well be self-deterring as a general matter, so that any need for an external sanction is slight. Purely "trade-based" manipulation schemes, in which the manipulator simply buys a security in order to induce higher prices and then sells to take advantage of the price change, are likely to fail. First, it is difficult unilaterally to cause price to rise. Second, it is even more difficult to sell subsequently at a price high enough to cover both purchase costs *and* transaction costs. For one thing, if the actor's purchases are such as to give the market a material upward thrust, his later sales may equivalently drive it down. See Fischel & Ross, *supra*, at 512–19. But see Steve Thel, "$850,000 in Six Minutes—The Mechanics of Securities Manipulation," 79 Cornell L. Rev. 219

(1994) (suggesting that manipulators may profit from very small, short-lived price changes).

■ These arguments, however, are of little use to Markowski and Riccio. Whatever the practical concerns, we cannot find the Commission's interpretation to be unreasonable in light of what appears to be Congress's determination that "manipulation" can be illegal solely because of the actor's purpose. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Section 9(a)(2) of the Securities Exchange Act, 15 U.S.C. § 78i(a)(2), manifests this idea by declaring it unlawful

> [t]o effect ... a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

*Id.*[1] This provision is quite separate from the subsections of § 9 prohibiting manipulation through fraudulent devices such as wash sales, 15 U.S.C. § 78i(a)(1)(A), matched sales, *id.* at § 78i(a)(1)(B)-(C), and false statements, *id.* at § 78i(a)(4). Given Congress's clear endorsement for sanctions against this sort of manipulation, the Commission's inclusion of it within the phrase "manipulative ... device" in § 10(b), *id.* at § 78j(b), cannot have been unreasonable.

The Commission's interpretation is also consistent with its rules governing an issuer's purchases of its own securities. See Securities Exchange Act of 1934, Rule 10b–18, 17 C.F.R. § 240.10b–18. Issuer repurchases are perfectly real transac-

tions. But the Commission has created a safe harbor measured in terms of timing, volume, and price; purchases outside the safe harbor are subject to possible enforcement action as manipulations. See Purchases of Certain Equity Securities by the Issuer and Others; Adoption of Safe Harbor, 47 Fed.Reg. 53,333 (1982).

Further, to the extent that the case against liability for "trade-based" manipulation depends on its inherently self–deterring character, petitioners' situation may be distinguishable. The activity in Mountaintop furthered an external purpose. At least in the short term, Global supported Mountaintop's price not to profit from later sales of Mountaintop, but to maintain customer interest in Global generally and to sustain confidence in its other securities. As James Shanley, Global's chief operating officer, testified, petitioner Riccio explained his refusal to lower his bid price: "If we do that on one stock, they [presumably, holders of Global's stocks] will hit us on all the stocks." Thus, the prospects of losing some money on Mountaintop in the short run would not deter Global from manipulating—if that cost was worth the benefit of keeping its customers and preserving confidence in its other stocks.

■ Apart from their conceptual attack on liability for manipulation where the trades are "real," petitioners argue that Global's $1,400,000 net loss on Mountaintop precludes any finding of scienter. In the alternative, they say that these losses in Mountaintop at least cut against a finding of manipulation. Neither variation is persuasive. Just because a manipulator loses money doesn't mean he wasn't trying. Indeed, as suggested above, attempts to support a price for an ulterior purpose seem unlikely to prevail if success will take a long time—protracted struggle against

---

1. 15 U.S.C. § 78i has been slightly altered since Global's closure in 1991, but those amendments are irrelevant in this proceeding.

market fundamentals will exhaust the manipulator's resources.

■ Petitioners' third claim asserts that some of the evidence before the Commission was so defective that the Commission's findings lack substantial evidence. They point to possible infirmities in the NASD's Chronological Transaction Analysis ("CTA"), which the NASD used to support its findings that Global's bid prices were higher than needed to acquire the stock, and that its inventories of Mountaintop securities were larger than could be explained by a genuine investment intent. However compelling the criticisms may be, they are inapposite. The Commission made clear that its findings of manipulation rested not on the CTA, but on the statements from the firm's own personnel. SEC Denial of Reconsideration at 2. That testimony, which the Commission was entitled to credit, substantially supports the Commission's key finding: that the firm bought Mountaintop securities in order to maintain their apparent market price.

For example, Shanley testified that Mountaintop securities opened "too high" and remained at high levels only because Global was "always supporting the stock." He further recounted conversations with Markowski in which he argued that supporting a stock against the market was impossible—as the event seemed to prove. And Gary Boccio, Global's compliance officer, testified that Markowski explained his refusal to reduce Global's inventory by saying that "he didn't want to show we had any weakness in the stocks." Indeed, Riccio himself admitted that although there was no demand in the open market, Global made the sole high bid for days, even months, on end. (Global evidently was able to off-load much of the Mountaintop stock that it acquired on special "clients" of Markowski, whose role—victims? co-conspirators? some other class?—neither side in this litigation has seen fit to explain.) Riccio said that he maintained Global's bids because he feared a drop in price and the customer complaints it would generate.

[4] Finally, Markowski challenges the SEC's findings that he violated Global's restriction agreement by maintaining inventory positions exceeding 200% of Global's excess net capital, and that he refused to submit to an NASD investigative interview. Markowski acknowledges the ancillary character of these issues, however, and asks for relief regarding them only if we find no basis for the principal manipulation charge. Since we find that sufficient grounds support the manipulation charge, we need not reach these issues.

■ In any event, the arguments are unconvincing. Substantial evidence, including testimony from Shanley and a memorandum from Boccio, support the SEC's finding that Markowski knew about Global's continuing violations of the restriction agreement. See, e.g., *Patrick v. SEC*, 19 F.3d 66, 69 (2d Cir.1994). Similarly, the SEC reasonably found that Markowski's eventual acquiescence in an NASD request for an interview two months after his scheduled interview and four months after NASD's initial request neither qualified as "full and prompt cooperation" nor was sufficient to cancel his prior recalcitrance. *In re Borth*, 51 S.E.C. 178, 180–81 (1992) (discussing the importance of timely cooperation with NASD investigations); *In re Williams*, 50 S.E.C. 1070, 1072, 1992 WL 165331 (1992) (holding that litigation concerns did not excuse delays in cooperation).

\*　　　\*　　　\*

The order of the SEC is

*Affirmed.*