# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued April 20, 2015               Decided July 14, 2015

No. 14-1134

DONALD L. KOCH AND KOCH ASSET MANAGEMENT, LLC,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

―――――

On Petition for Review of an Order of
the Securities & Exchange Commission

―――――

*Thomas O. Gorman* argued the cause for the petitioners.

*Dominick V. Freda*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for the respondent. *Michael A. Conley*, Deputy General Counsel, *John W. Avery*, Deputy Solicitor, and *Theodore J. Weiman*, Senior Counsel, were with him on brief.

Before: HENDERSON and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*:

> The main purpose of the stock market is to make fools of as many men as possible.
>
> — Bernard M. Baruch

As an investment adviser, Donald Koch purchased stock from three small banks and made trades to increase the price of those shares immediately before the daily close of the stock market. This piqued the market-manipulation antennae of the Securities and Exchange Commission (SEC or Commission). The SEC investigated Koch and his company, Koch Asset Management (KAM), and eventually charged them both with marking the close. Marking the close is investor argot for buying or selling stock as the trading day ends to artificially inflate the stock's value. *See Black v. Finantra Capital, Inc.*, 418 F.3d 203, 206 (2d Cir. 2005). The SEC found that Koch and KAM repeatedly marked the close and sanctioned them accordingly. Although we agree with the Commission's order in large part, one of the SEC's sanctions is impermissibly retroactive and requires us to grant the petition in part and vacate the order in part.

## I. BACKGROUND

### A. SECURITIES LEGISLATION

The Securities and Exchange Act of 1934 (Exchange Act) "was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). To accomplish this goal, the Exchange Act makes it unlawful for "any person," in connection with the purchase or sale of securities, "[t]o use or employ . . . any

manipulative or deceptive device or contrivance in contravention of [SEC] rules." 15 U.S.C. § 78j(b). The Commission's regulations, in turn, make it unlawful for "any person," in connection with the purchase or sale of securities, "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5(a), (c).

The Investment Advisers Act of 1940 (Advisers Act) proscribes nearly identical conduct. The Act makes it unlawful for "any investment adviser" to "employ any device, scheme, or artifice to defraud any client or prospective client" or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b–6(1), (4). To implement these prohibitions, the SEC requires investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation[s]" of the Advisers Act. 17 C.F.R. § 275.206(4)–7(a).

Like the crash in 1929, the wreckage wrought by the Great Recession of 2008 produced calls for reform, ultimately resulting in the Dodd–Frank Wall Street Reform and Consumer Protection Act (Dodd–Frank Act), Pub. L. No. 111-203, 124 Stat. 1376 (2010). Before the Dodd–Frank Act, the SEC could bar individuals who violated either the Exchange Act or the Advisers Act from associating with various people in the securities world, including stock brokers, dealers and investment advisers. *See* 15 U.S.C. § 78*o*(b)(4)(F) (2006) (Exchange Act violator may be barred from "associat[ing] with a broker or dealer"); *id*. § 80b–3(f) (2006) (Advisers Act violator may be barred from "associat[ing] with an investment adviser"). The Dodd–Frank Act expanded this power. Now, the Commission may also bar violators from associating with municipal advisors or

"nationally recognized statistical rating organizations" (rating organizations). *See* Dodd–Frank Act § 925(a). The SEC's enlarged authority created remedies that were "not previously available under the securities laws" before the Dodd–Frank Act. John W. Lawton, Advisers Act Release No. 3513, 2012 WL 6208750, at *5 (Dec. 13, 2012).

## B. THE FACTS

Koch founded KAM in 1992 and was its sole investment adviser, owner and principal. Koch's investment strategy was to buy stock from small community banks as long-term investments. KAM used Huntleigh Securities Corporation, a registered broker-dealer, to execute trades and maintain client accounts. Although Catherine Marshall was Huntleigh's agent assigned to handle KAM's, and Koch's, business, Koch contacted a trader at Huntleigh's trading desk directly when he wanted to make a trade. As of September 2009, Koch's contact at Huntleigh's trading desk was Jeffrey Christanell.

In the wake of the 2008 market crash, Koch's clients became increasingly worried that their investments would decline in value. Around the same time, Huntleigh began allowing account holders, like Koch's clients, to access their account information online. This frustrated Koch because he wanted his clients to get investment information from *him*, not a website. He also worried that his clients would be concerned if their online account information suggested that their accounts were underperforming. To ensure that his clients' accounts appeared to retain their value, Koch allegedly marked the close between September and December 2009 for three small bank stocks: High Country Bancorp, Inc.; Cheviot Financial Institution; and Carver Bancorp, Inc.

Koch's conduct aroused suspicions. A New York Stock Exchange Arca investigator sent a letter to Huntleigh to Marshall's attention regarding Koch's trading. The letter specifically asked Huntleigh to provide information on its policies and procedures for preventing traders from marking the close. After receiving the letter, Marshall asked Koch whether he had marked the close. Koch denied the allegations and said, among other things, that he was simply trying to get rid of some excess cash in a client's account. Huntleigh evidently did not buy this explanation, as it subsequently fired Christanell for violating its trading policies and terminated its relationship with KAM.

The SEC then launched an investigation into Koch's trading activity. In April 2011, it instituted proceedings against KAM and Koch, charging both as primary violators under the Exchange Act, the Advisers Act and their respective implementing regulations. A hearing before an administrative law judge (ALJ) followed. The ALJ found that Koch illegally marked the close for High Country stock on September 30 and December 31, and for Cheviot and Carver stock on December 31. The ALJ also found that Koch violated the Advisers Act regulations by failing to follow KAM's policies and procedures designed to prevent Advisers Act violations. Koch and KAM appealed the ALJ's decision to the Commission.

The Commission affirmed the ALJ's decision in a 37-page opinion. It reviewed a series of telephone conversations, emails and other information related to Koch's trading activity. It found "compelling" evidence that Koch intended to manipulate the trading price for all three bank stocks by marking the close on September 30 and December 31. Donald Koch & Koch Asset Management, LLC, Exchange Act Release No. 72179, 2014 WL 1998524, at *10 (May 16, 2014)

(*Order*).  It also determined that the expert testimony Koch presented to the ALJ was unreliable and that Koch's innocent explanations for his trading activity failed to hold water.  The Commission ultimately issued five remedial orders to enforce its decision; the one principally relevant here is its order barring Koch from associating with "any investment adviser, broker, dealer, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization."  *Id*. at \*25.  Koch timely petitioned this Court for review.  We have jurisdiction pursuant to 15 U.S.C. §§ 78y(a), 80b–13(a).

## II.  ANALYSIS

Our standard of review is familiar:  The Commission's findings of fact "if supported by substantial evidence" are "conclusive."  *Id.* §§ 78y(a)(4), 80b–13(a).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quotation marks omitted).  The Commission's "other conclusions may be set aside only if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Graham v. SEC*, 222 F.3d 994, 999–1000 (D.C. Cir. 2000) (citing 5 U.S.C. § 706(2)(A)) (quotation marks omitted).  Additionally, we "accord great deference to the SEC's remedial decisions" and will not disturb them unless they are "unwarranted in law or without justification in fact."  *Horning v. SEC*, 570 F.3d 337, 343 (D.C. Cir. 2009) (alterations omitted).

Koch presses three arguments on appeal.  First, he argues that the SEC's factual findings were not supported by substantial evidence and that its legal conclusions misread the governing statutes.  Second, he claims that the Commission

erred in charging Koch as a primary violator under both the Exchange Act and the Advisers Act. And third, he contends that the Commission's order barring him from associating with municipal advisors or rating organizations is impermissibly retroactive. We take each argument in turn.

## A. APPLICATION OF LAW & SUFFICIENCY OF EVIDENCE

Koch's primary argument on appeal is that the Commission's decision applied the wrong legal standard and is not supported by substantial evidence. We think the contrary is true: The Commission applied the correct standard and properly concluded that there is ample evidence Koch manipulated the market by marking the close.

As explained, the Exchange Act and the Advisers Act prohibit fraudulent and manipulative conduct. Market-manipulative behavior is "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst*, 425 U.S. at 199. Under Commission precedent, a charge of marking the close consists of two elements: (1) "conduct evidencing a scheme to mark the close—*i.e.*, trading at or near the close of the market so as to influence the price of a security"; and (2) "scienter, defined as a mental state embracing intent to deceive, manipulate, or defraud." *Order*, 2014 WL 1998524, at *9 & n.97 (collecting cases).[1]

---

[1] Liability under the Advisers Act can also be premised on negligence. *See SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)). Because neither party claims the Commission's decision turned on negligence, we assess Koch's manipulative intent.

The Commission relied on the following evidence to conclude that Koch marked the close for High Country stock on September 30 and December 31, 2009. On September 30, KAM purchased nearly 2,000 shares of High Country stock, "the vast majority in the last four minutes of trading." *Id*. at *9. These were the only trades that day involving High Country and they pushed the stock's closing price to $23.50 per share. Tellingly, High Country stock *never* traded above $20 again in 2009.

In addition, Koch emailed Christanell on September 30 and told him to "move last [High Country] trade right before 3pm up to as near $25 as possible *without appearing manipulative*." *Id*. at *10 (emphasis added). Koch attempts to downplay this smoking gun by arguing that he only meant to tell Christanell to not "place large orders that could disturb the [stock's] price." Pet'r's Br. 41. Yet, as the Commission rightly noted, "Koch's instruction contains no information at all about the size of incremental purchases that Christanell should make." *Order*, 2014 WL 1998524, at *10. And if Koch were in fact concerned only with the size of the purchases, it made little sense to include a gratuitous warning to avoid appearing manipulative. His professed lawful intent is also contradicted by Christanell's testimony (which the SEC credited) that Christanell placed last-minute bids for High Country "to get the price up to where Koch asked him to get it." *Id*. (alterations omitted). In short, Koch's explanation is implausible.

Likewise, on December 31, KAM purchased 3,200 shares of High Country stock "all within the last five minutes of trading." *Id*. This pushed the High Country closing price to $19.50 on December 31, even though every other trade of High Country stock that day was priced no higher than $17.50. This evidence of marking the close is again buttressed by

Koch's emails to Christanell. On December 28, Koch directed Christanell "to buy High Country 30 minutes to an hour before the close of market for the year" and explained that he wanted "to get a closing price for High Country in the 20–25 [dollar] range, but certainly above 20." *Id*. (alterations omitted). Koch's intent could not have been plainer: buy stock right before trading closes in order to drive up the price. In other words, mark the close.

Moreover, a series of recorded phone calls between Koch and Christanell on December 31 reinforces Koch's intent. Koch told Christanell that "my parameters for High Country are—if you need 5,000 shares, *do whatever you have to do*—I need to get it above 20, you know, 20 to 25, I'm happy." *Id*. at *11 (emphasis added; alterations omitted). Koch also instructed Christanell to "just create prints," which Christanell testified he understood to mean "get the stock price up for the last trade of the day." *Id*. (quotation marks omitted). When Christanell failed to get the price high enough before the market closed, he apologized to Koch and said, "I know you wanted it higher and I tried." *Id*.

As with the High Country stock, there is abundant evidence to support the Commission's conclusion that Koch marked the close for Cheviot and Carver stock on December 31. Christanell, at Koch's direction, engaged in a flurry of trades for Cheviot stock only minutes before the market closed on December 31. As the Commission explained:

> Christanell placed orders for several thousand shares of Cheviot in the final three minutes of trading. KAM's last execution from these orders was a purchase of 200 shares at a price of $7.99 just seven seconds before 3 p.m., Central time, but a later non-KAM trade for Cheviot set the closing price for

the stock at $7.39. At nine seconds after 3 p.m., Christanell placed another KAM order for additional Cheviot shares, which almost immediately resulted in three executions—two at $8.00 and one at $8.19. These final three trades, however, came after the official close of the market and therefore none of them set the closing price.

*Id.* This burst of trading cannot be explained by anything other than intent to mark the close. True, Christanell's final three trades ultimately failed to set the closing price. But *successful* market manipulation is not equivalent to *intent* to manipulate the market. *See Markowski v. SEC*, 274 F.3d 525, 529 (D.C. Cir. 2001) ("Just because a manipulator loses money doesn't mean he wasn't trying [to manipulate]."). And intent—not success—is all that must accompany manipulative conduct to prove a violation of the Exchange Act and its implementing regulations. *See id.* (the Congress has "determin[ed] that 'manipulation' can be illegal *solely* because of the actor's purpose" (emphasis added)); *accord Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969) ("The statutory phrase 'any manipulative or deceptive device,' seems broad enough to encompass conduct *irrespective of its outcome.*" (emphasis added; citation omitted)).

Additionally, phone calls between Koch and Christanell on December 31 confirm Koch's intent to mark the close on Cheviot stock. Early in the day, Christanell told Koch that the "bid-ask spread for Cheviot was $7.20 to $7.48." *Order*, 2014 WL 1998524, at *12. After learning this, Koch told Christanell to "move it to above 8—8, 8 and a quarter by the end of the day." *Id.* (quotation marks omitted). Koch thought the move would be easy because Cheviot stock "trades so little [and] I think you'll be able to get it up pretty fast." *Id.* When Christanell was unable to set the closing price at $8.00,

Koch expressed disappointment but told Christanell, "Okay, you did the best you can." *Id*.

Koch's trading of Carver stock on December 31 followed the same path. KAM purchased 200 shares of Carver stock, the last of them "one-and-a-half minutes before the market closed." *Id*. The evidence before the Commission indicated that KAM's 200-share purchase was the only time that Carver stock traded that day. In a give-and-take that by now sounds familiar, Christanell informed Koch on December 31 that the spread for Carver stock was $8.10 to $9.05. Koch then told Christanell to "at the end of the day . . . pop that one [*i.e.*, Carver]—to 9.05, if you have to." *Id*. at 13 (alterations in original). When Christanell proposed buying 300 shares of Carver stock at $9.05 a share, Koch said, "That's perfect. Just make sure you get a print." *Id*. (Recall, Christanell testified that getting a "print" means getting a stock's price up for the last trade of the day, *supra* p. 9.) Before the ALJ, Christanell testified that he purchased Carver stock on December 31 because "[Koch] wanted it to close at $9.05." *Id*. (alterations omitted).

In the face of this strong evidence that Koch marked the close, Koch claims that the Commission committed three specific errors. We are not convinced.

First, Koch claims that the Commission failed to find he had the intent to deceive or manipulate the market. We are puzzled by this claim because the Commission's order repeatedly made such findings. *See id*. at *10 (email is "compelling direct evidence of [Koch's] intent to mark the close of High Country stock on September 30, 2009"); *id*. (certain emails "offer strong support for [Koch's] intent to mark the close of High Country stock on December 31, 2009"); *id*. at *11 ("The recorded telephone conversations between

Koch and Christanell on December 31, 2009, bolster the already strong evidence of intent."); *id.* at \*12 ("[T]elephone conversations are persuasive direct evidence of [Koch's] intent to mark the close of Cheviot stock on December 31, 2009."); *id.* at \*13 ("We find further that [Koch] acted with scienter in [his] purchase of Carver stock in the final minutes of the trading day on December 31, 2009.").

Koch repackages his argument by asserting that the SEC presumed manipulative intent based solely on the fact that he raised each stock's price. Not true. As discussed, *supra* pp. 8–11, the Commission examined trading data, emails and phone calls on September 30 and December 31 to determine whether Koch intended to mark the close. The Commission's exhaustive review of the record refutes the notion that it applied any conclusive presumption. In fact, the Commission even acknowledged that "some of the trading at issue here, standing alone, [could be seen] as consistent with legitimate attempts to obtain illiquid stocks." *Order*, 2014 WL 1998524, at \*16. The Commission's acknowledgment that some of Koch's trades appeared legitimate "standing alone" highlights that it applied no conclusive presumption to his case.

Second, Koch claims that the Commission ignored evidence that he wanted "the most favorable terms [*i.e.*, prices] reasonably available" for the stocks—"best execution," in industry-speak. *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 (3d Cir. 1998). As the Commission noted, Christanell did testify that he thought the trades "represented best execution." *Order*, 2014 WL 1998524, at \*18 n.189 (quotation marks omitted). But the Commission also pointed out that this testimony "cannot be squared fully with [Christanell's] testimony that these trades were different from typical trading because they did not involve trying to purchase [stocks] at the best price we can."

*Id*. (quotation marks and alteration omitted). Moreover, Christanell's understanding of best execution cannot override the abundant direct and circumstantial evidence of Koch's manipulative intent. *See supra* pp. 8–11. The trading data, emails and recorded phone conversations demonstrate that Koch intended to raise the price of securities before the market closed—an intent that is inconsistent with a desire to seek best execution.[2]

Third, Koch claims he could not be liable under the Exchange Act and the Advisers Act unless the Commission found that his trades had a "market impact." Pet'r's Br. 46. Koch's only authority for this proposition is *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977). But *Santa Fe* says nothing of the sort. All the Court said was that "manipulation" is a "term of art" that refers to practices "intended to mislead investors by artificially affecting market activity." *Id*. The Court did not, by this language, require the SEC to prove actual market impact, as opposed to *intent* to affect the market, before finding liability for manipulative trading practices. Had the Court wished to impose such a requirement, it would have said so clearly. Nevertheless, assuming *arguendo* that *Santa Fe* imposes a market impact requirement, it is met here. The entire premise of marking the close is to increase a share's price to an "artificially high level." *Black*, 418 F.3d at 206. That is consistent with the Court's

---

[2] Koch's opening brief also claims that the Commission ignored contradictory evidence from three witnesses regarding best execution. Although Koch identifies the three witnesses by name, he does not identify the pages in the record where the contradictory testimony for two of them can be found. And while he explains what he thinks is the contradictory evidence presented by the third witness, Professor Jarrell, we agree with the Commission that his testimony is flawed. *See Order*, 2014 WL 1998524, at *16–17.

definition of manipulation in *Santa Fe*, *i.e.*, a practice designed to "artificially affect[] market activity." 430 U.S. at 476. Accordingly, because there is substantial evidence that Koch marked the close, there is also substantial evidence that he "artificially affect[ed] market activity." *Id.*; *see also Order*, 2014 WL 1998524, at *9–12 (explaining the inflated prices Koch achieved on September 30 and December 31).

Much of Koch's brief simply takes issue with how the Commission interpreted the evidence before it. The SEC saw a manipulative scheme to mark the close; Koch professes it was an honest attempt to deal with a small and illiquid market. We need not pick between these competing narratives. Although Koch urges us to read the record differently, we may not "supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992). As we have remarked many times before, an agency's conclusion "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994); *see also Domestic Sec. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003) ("[T]he resolution of conflicting evidence is for the Commission, not the court."). Consequently, it is the "rare" case in which we conclude that an agency's decision is not supported by substantial evidence. *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008); *see also id.* ("Substantial-evidence review is highly deferential to the agency fact-finder."). This case is not one of them.

We conclude that the Commission applied the correct legal standard and that there is substantial evidence to support its decision.

## B.  KOCH *QUA* PRIMARY VIOLATOR

Koch next argues that he could not be charged as a primary violator under either the Exchange Act or the Advisers Act. His argument is premised on *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), and the text of the Advisers Act.   He misreads both.

In *Janus*, the question before the Court was what individual or entity could be liable for "mak[ing] any untrue statement of a material fact" in violation of the Exchange Act regulations.   131 S. Ct. at 2301.   It held that "the maker of a statement is the person or entity with ultimate authority over the statement" and not "[o]ne who prepares or publishes a statement on behalf of another."   *Id*. at 2302.   *Janus* does not apply here, however, because Koch was not charged with making a statement.   Rather, he was charged with marking the close, which is not a statement but "a form of market manipulation."   *Order*, 2014 WL 1998524, at *1.   In other words, Koch violated the securities laws not because of what he *said* but because of what he *did*.   Koch improperly conflates those who make statements (at issue in *Janus*) with those who employ manipulative practices (at issue here).   *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) ("Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device *or* makes a material misstatement (or omission) . . . may be liable as a primary violator." (emphasis added)).   For this reason, *Janus* is inapplicable if the alleged Exchange Act violations turn not on statements but on manipulative conduct.   *See SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) (per curiam) ("*Janus* has no bearing" because "[t]he case against [appellants] did not rely on their 'making' false statements, but instead concerned their commission of deceptive acts").

Koch's argument regarding the Advisers Act's text is also flawed. He claims that only advisers who are registered with the SEC can be primary violators under the Advisers Act. Because KAM, not Koch, is the only adviser registered with the SEC, he maintains that he cannot be a primary violator under the Advisers Act. The Advisers Act, however, draws no such distinction. That Act makes it unlawful for "*any* investment adviser" to "employ any device, scheme, or artifice to defraud any client or prospective client" or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b–6(1), (4) (emphasis added). The Advisers Act, in turn, defines investment adviser as "*any* person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," subject to exceptions not relevant here. *Id*. § 80b–2(a)(11) (emphasis added). The definition of investment adviser does not include whether one is registered or not with the SEC. Hence, Koch could be primarily liable for violating the Advisers Act irrespective of registration with the Commission. *See United States v. Onsa*, 523 F. App'x 63, 65 (2d Cir. 2013) ("[T]he structure of the [Advisers] Act demonstrates that individuals need not register, or even be *required* to register, in order to be an 'investment adviser' within the meaning of the Act.").

Accordingly, we hold that Koch was properly charged as a primary violator under both the Exchange Act and the Advisers Act.

## C. APPLICABILITY OF DODD–FRANK ACT

Koch's final argument is that the Commission could not use the remedial provisions of the 2010 Dodd–Frank Act to

punish him for conduct that took place in 2009. Doing so, he claims, is impermissibly retroactive. We agree that the Commission impermissibly applied the Dodd–Frank Act retroactively by barring Koch from associating with municipal advisors and rating organizations.[3]

"[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265. It generally requires "that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Id*. But retroactive legislation is not *per se* unlawful. Indeed, "[r]etroactivity provisions often serve entirely benign and legitimate purposes." *Id*. at 267–68. Absent a constitutional violation, "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." *Id*. at 267. Nevertheless, to lessen the inherent unfairness of retroactive application, courts do not enforce a statute retroactively unless the "Congress first make[s] its intention clear." *Id*. at 268. Our first task, then, is to

---

[3] Koch also argues that applying the Dodd–Frank Act to him is impermissibly retroactive because it changed the Commission's procedures for imposing sanctions. It is true that under the Act, the SEC may bar Koch from associating with all industries in the securities market in one proceeding, whereas before the Act the Commission had to initiate "follow-on proceeding[s]" for separate industries in the securities market. *See Lawton*, 2012 WL 6208750, at *5. This change in procedure, however, does not give rise to retroactivity concerns. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 (1994) ("Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive.").

determine "whether Congress has expressly prescribed the statute's proper [temporal] reach." *Id*. at 280.

The provision of the Dodd–Frank Act permitting the Commission to bar an individual from associating with municipal advisors or rating organizations contains no mention of retroactive application. *See* Pub. L. No. 111-203, § 925(a). The closest the Act comes is its generic statement that "[e]xcept as otherwise specifically provided in this Act," the Act's provisions "shall take effect 1 day after the date of enactment." *Id*. § 4. But this language says nothing about retroactivity. As the Court noted in *Landgraf*, "A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." 511 U.S. at 257. Because the Dodd–Frank Act does not expressly authorize retroactive application, we must determine whether applying it to Koch "would impair rights [he] possessed when he acted, increase [his] liability for past conduct, or impose new duties with respect to transactions already completed." *Id*. at 280.

At the time Koch engaged in manipulative conduct, that is, from September through December 2009, the SEC could not bar an individual or entity from associating with municipal advisors or rating organizations. *See Lawton*, 2012 WL 6208750, at *5 (noting those remedies "[were] not . . . available under the securities laws" before Dodd–Frank Act). The Commission's decision to nevertheless apply the Act's new penalty to Koch "attach[ed] a new disability to conduct over and done well before [its] enactment." *Vartelas v. Holder*, 132 S. Ct. 1479, 1487 (2012) (quotation marks omitted). Indeed, by including *additional* associations from which one could be barred, the Act enhanced the penalties for a violation of the securities laws. The result is the same even if we ask the slightly different question "whether the new provision

attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 270. Applying the Act to Koch "attache[d] new legal consequences" to his conduct by adding to the industries with which Koch may not associate. *Id.* The additional prohibitions are legally enforceable and thereby create new legal consequences for past conduct. Hence, applying the Dodd–Frank Act's enhanced penalties to Koch is impermissibly retroactive.

The SEC identifies two cases that purportedly suggest the Dodd–Frank Act is not impermissibly retroactive. *See Kansas v. Hendricks*, 521 U.S. 346 (1997); *Boniface v. DHS*, 613 F.3d 282 (D.C. Cir. 2010). Both cases, however, held that there was no retroactivity problem because each subsequently enacted provision created only an evidentiary presumption. *Hendricks*, 521 U.S. at 371 ("To the extent that past behavior is taken into account, it is used, as noted above, solely for evidentiary purposes."); *Boniface*, 613 F.3d at 288 (regulation only creates "an evidentiary presumption that an applicant with a disqualifying conviction in his past poses a security threat in the present; the applicant may rebut that presumption through the waiver process" (quotation marks omitted)). Here, by contrast, Koch's past conduct automatically triggered additional legal consequences, not existing at the time his conduct took place, that prevent him from associating with rating organizations or municipal advisors.

Accordingly, we conclude that the Commission cannot apply the Dodd–Frank Act to bar Koch from associating with municipal advisors and rating organizations because such an application is impermissibly retroactive. This holding does not apply to the other securities industries with which Koch may not associate.

20

*   *   *

For the foregoing reasons, the petition for review is granted in part and denied in part and the portion of the SEC order that is impermissibly retroactive as described herein is vacated.

*So ordered.*