# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 17, 2016      Decided January 17, 2017

No. 14-1070

GREGORY BARTKO,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of
the Securities and Exchange Commission

*Brian R. Matsui*, appointed by the court, argued the cause as the *amicus curiae* in support of the appellant. *Bryan J. Leitch* and *Deanne E. Maynard* were with him on brief.

*Gregory Bartko*, pro se, filed the briefs for the appellant.

*Daniel Matro*, Attorney, United States Securities and Exchange Commission, argued the cause for the respondent. *John W. Avery*, Deputy Solicitor, *Dominick V. Freda*, and *Stephen G. Yoder*, Senior Litigation Counsel were with him on brief.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Between 2004 and 2005, Gregory Bartko masterminded a wide-ranging scheme that sought to defraud investors through the sale of securities. Five years later, Bartko was convicted of conspiracy, selling unregistered securities and mail fraud. Shortly thereafter, the United States Securities and Exchange Commission (SEC or Commission) instituted a follow-on administrative proceeding against him. In that proceeding, the Commission, *inter alia*, permanently barred Bartko from associating with six classes of securities market participants.[1]

Bartko's petition for review raises multiple challenges to the Commission's order. We have accorded each of Bartko's arguments "full consideration after careful examination of the record, but address in detail only those arguments that warrant further discussion." *See, e.g.*, *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 213 (D.C. Cir. 2016); *United States v. Garcia*, 757 F.3d 315, 321 (D.C. Cir. 2014) ("We have given full consideration to the various additional arguments that [appellant] raises, but find none convincing or worthy of discussion."). Although we agree with the Commission's findings and conclusions, we believe it applied the bar regarding five of the six classes in an impermissibly retroactive manner. For the reasons that follow, we grant the petition in part and deny it in part.

---

[1] In its order, the Commission barred Bartko from the broker-dealer, investment adviser, municipal securities dealer, transfer agent, municipal advisor and nationally recognized statistical ratings organization (NRSRO) classes. *But see infra* at 12 n.6.

## I. BACKGROUND

### A. *Statutory Landscape*

With the enactment of section 203(f) of the Investment Advisers Act of 1940, *see* 15 U.S.C. § 80b-3, and sections 15(b), 15B(c) and 17A(c) of the Securities Exchange Act of 1934, *see id.* §§ 78*o*(b), 78*o*-4(c), 78q-1(c), the Congress authorized the SEC to oversee the registration and licensing of four different classes of participants in the securities markets: brokers and dealers, municipal securities dealers, transfer agents and investment advisers. *See id.* §§ 78*o*, 78*o*-4, 78q-1, 80b-3 (2000) (respectively, broker-dealers, municipal securities dealers, transfer agents and investment advisers). As relevant here, these statutory provisions also authorized the Commission to suspend or bar a participant from specific classes if certain conditions were met. *See id.* §§ 78*o*(b)(6)(A), 78*o*-4(c)(4), 78q-1(c)(4)(C), 80b-3(f). Generally, to impose such a sanction, the Commission had to first demonstrate that the penalty was in the public interest. *See id.* Second, the Commission had to show that the participant was, *inter alia*, convicted of a specified offense within the last ten years or had been enjoined by the SEC from working in the industry. *See id.* Finally, the Commission had to show that the participant was associated with—or seeking to become associated with—one of the four classes either at the time of the alleged misconduct or at the time of registration. *See id.*

Originally, the Commission read these provisions as authorizing a "collateral bar." *E.g.*, *Meyer Blinder*, Exchange Act Release No. 39180, 1997 WL 603788, at *3-5. (Oct. 1, 1997). A collateral bar is a tool by which the SEC can ban a market participant from associating with *all classes* based on misconduct regarding only *one* class. *See id.* at *5-6. Thus, through the imposition of a collateral bar, the Commission

could not only bar an investment adviser from associating with the investment adviser class but also from the broker-dealer, municipal securities dealer and transfer agent classes—even if he had no association with those classes. *See id.*

This Court, however, rejected the Commission's notion that section 203(f) of the Advisers Act and sections 15(b), 15B(c) and 17A(c) of the Exchange Act sanctioned a collateral bar. *See Teicher v. SEC*, 177 F.3d 1016, 1019-20 (D.C. Cir. 1999). In *Teicher*, we noted that both statutes set forth "an almost identically worded threshold nexus requirement" that "underscore[d] a congressional determination to create separate sets of sanctions . . . ." *Id.* at 1020. Because each statute required a market participant to be, at a minimum, "seeking to become associated" with a class before he could be barred from it, *see* 15 U.S.C. §§ 78*o*(b)(6)(A), 78*o*-4(c)(4), 78q-1(c)(4)(C), 80b-3(f) (2000), we held that the Commission could not bar an individual from a class that he had no association—no "nexus"—with, *see Teicher*, 177 F.3d at 1020-21. An investment adviser could be immediately barred from associating with the investment adviser class; a broker-dealer could be barred from associating with the broker-dealer class—but because a collateral bar was not statutorily authorized, the SEC could not bar him from other classes unless and until he sought to associate with those classes. *See id.*

In 2010, the enactment of Dodd-Frank changed the landscape. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), Pub. L. No. 111–203, 124 Stat. 1376 (2010). Perhaps in response to the Commission's lobbying,[2] the Congress empowered it to impose a collateral

---

[2] The legislative history reveals in part that, in 2009, then-SEC Chairman Mary L. Schapiro asked the Congress to give "the SEC the authority to bar a regulated person who violates the securities laws in

bar. *See* Pub. L. No. 111-203, 124 Stat. 1376, 1850-51 (July 21, 2010). In addition, Dodd-Frank expanded the Commission's reach, adding two new classes to its purview: municipal advisers and nationally recognized statistical rating organizations ("NRSROs"). *See* 15 U.S.C. §§ 78*o*(b)(6)(A), 78*o*-4(c)(4), 78q-1(c)(4)(C), 80b-3(f) (2012). Under Dodd-Frank, then, the Commission is now able to bar a securities market participant from the six listed classes—broker-dealers, investment advisers, municipal securities dealers, transfers agents, municipal advisers and NRSROs—based on misconduct in only one class. *See id.* In effect, Dodd-Frank removed the industry-specific "nexus" central to the *Teicher* holding, making available an industry-wide ban for class-specific misconduct. *See id.*

### B.   *Factual Background*

From 1999 to 2011, Bartko, a securities lawyer, served as the chief executive officer and chief compliance officer of Capstone Partners, L.C., a registered broker-dealer under section 15 of the Exchange Act, 15 U.S.C. § 78*o*. Between 2004 and 2005, Bartko also oversaw two private equity funds: the Caledonian Fund and the Capstone Fund (Funds). These

---

one part of the industry, for example a broker-dealer who misappropriates customers funds, from access to customer funds in another part of the securities industry (such as an investment adviser)." *Hearing Before the H. Comm. on Fin. Servs.*, 111th Cong., 65-66 (2009). She also noted that, by authorizing the SEC to "impose collateral bars," the Congress would enable it "to more effectively" regulate the various classes. *Id.*

two Funds were at the center of Bartko's subsequent criminal prosecution.[3]

Bartko's troubles began in early 2004, when, after creating the two Funds, he began to recruit investors. Rather than undertaking the search for capital himself, Bartko joined John Colvin and Scott Hollenbeck, who took on that task for him. There was a significant problem with this arrangement, however: Colvin and Hollenbeck had a history of using questionable sales tactics. Both had previously been accused of fraudulent sales practices and Hollenbeck was the subject of a cease and desist order regarding securities sales in North Carolina. Despite having access to his two partners' history, *see* Joint Appendix 54-57, Bartko made no effort to distance himself from them. Instead, he entered into agreements under which Colvin and Hollenbeck were to raise millions of dollars for the two Funds.

Over the next two years, both Funds' coffers were filled by way of fraud and deception. For example, Hollenbeck held numerous seminars across the country, inducing investors to give him their money with false claims that their investments were fully insured and had a guaranteed return. His tactics achieved their purpose, as approximately two hundred investors poured hundreds of thousands of dollars into the two Funds.

The actions of Bartko's partners did not go unnoticed. In March 2005, an SEC lawyer warned Bartko of Hollenbeck's questionable fund-raising techniques. Bartko insisted that Hollenbeck was merely a "finder" for the Funds and further claimed that Hollenbeck only "forward[ed] the names of

---

[3] The facts herein set forth are only those relevant to the petition before us. The complete details of Bartko's crimes are set forth in *United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013).

interested and qualified investors" to him. Joint Appendix 79. In the months that followed, Bartko attempted to work with the Commission. He offered Capstone Fund materials for SEC inspection, allowed the Commission to undertake unannounced "spot" examinations of Bartko's business and voluntarily disclosed many confidential financial documents, all—Bartko alleges—in reliance on the Commission's assurances that the information was confidential and to be used to investigate Hollenbeck's actions only. Additionally, Bartko filed an interpleader action on behalf of the Capstone Fund in the Middle District of North Carolina in a purported attempt to return funds to investors. Investors in the two Funds ultimately lost a total of $885,946.89.

## C. *Procedural History*

In January 2010, Bartko was indicted in the Eastern District of North Carolina on one count of conspiracy, one count of selling unregistered securities and four counts of mail fraud. After a thirteen-day trial, a jury convicted Bartko on all six counts. Bartko sought a new trial, claiming that the prosecution failed to disclose material exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and that it knowingly allowed government witnesses to testify falsely in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The district court denied Bartko's motion, emphasizing that "Bartko's case was not a close one" as "overwhelming evidence of Bartko's guilt" had been presented at trial. *United States v. Bartko*, No. 5:09-CR-00321-D, at 116-18 (E.D.N.C. Jan. 17, 2012). The Fourth Circuit affirmed Bartko's conviction and sentence. *United States v. Bartko*, 728 F.3d 327, 347 (4th Cir. 2013). Although it recognized that "serious errors" by the government

had infected Bartko's prosecution,[4] *see id.* at 343, it found those errors insufficient to overturn his conviction, *id.* at 342 ("[O]ur confidence in the jury's conviction of Bartko was not undermined by the government's misconduct in this case.").

On January 18, 2011, the Commission issued an Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Exchange Act and Section 203(f) of the Advisers Act to further sanction Bartko for his misconduct. In his response, Bartko argued that the government had "unclean hands" based on its misconduct during his criminal trial and on improper collusion between the governmental authorities. Accordingly, Bartko argued that the Commission "should be barred or estopped" from using his tainted conviction as the basis of follow-on action. Joint Appendix 4. An ALJ recommended against Bartko, however, rejecting Bartko's discovery request related to his unclean hands defense and applying Dodd-Frank's enhanced penalties to bar him from associating with not only the broker-dealer class but also the investment adviser, municipal securities dealer and transfer agent classes.

---

[4] The Fourth Circuit first noted that the prosecution made specific promises to Hollenbeck (who testified against Bartko) that information he provided would not later be used against Hollenbeck. *Bartko*, 728 F.3d at 335-37. At trial, however, it failed to "correct Hollenbeck's answers when he testified falsely that [the government] had not made any promises" to him. *Id.* at 337. The Fourth Circuit also found that government acted improperly when it failed to disclose proffer agreements with Hollenbeck and his wife. *Id.* at 338-39. "If Bartko had had the . . . agreements, he could have used them in an attempt to attack Scott Hollenbeck's credibility." *Id.* at 338. Finally, the government improperly failed to disclose a tolling agreement that, according to Bartko, would have been useful to his defense as impeachment material. *Id.* at 339-40.

Bartko then petitioned the Commission for review of the ALJ order. The Commission iterated barring Bartko from acting as a broker-dealer, investment adviser, municipal securities dealer and transfer agent was in the public interest—Bartko demonstrated "a fundamental lack of commitment to investor protection principles," thereby creating a "risk that he would engage in similar conduct if presented with future opportunities." *Id.* at 372. The Commission also rejected Bartko's unclean hands defense, noting that the defense "is not generally available in a Commission action." *Id.* at 382. But the Commission did not stop there. Instead, it extended Bartko's bar to exclude him from the municipal advisor and NRSRO classes as well. The Commission reasoned that imposing Dodd-Frank's collateral bar on Bartko (whose misconduct, again, occurred before the enactment of Dodd-Frank) did not constitute an impermissibly retroactive penalty because "[s]uch collateral bars . . . are appropriately applied as 'prospective remedies whose purpose is to protect the investing public from future harm.'" *Id.* at 376-77.

Bartko timely petitioned for review. Our jurisdiction is based on 15 U.S.C. §§ 78y(a), 80b-13(a).

## II.   ANALYSIS

### A.   *Retroactive Application of Dodd-Frank*

Bartko first argues that the Commission's imposition of Dodd-Frank's collateral ban constitutes an impermissibly retroactive penalty because it is premised on pre-Dodd-Frank misconduct. We agree.

The United States Supreme Court has recognized a "deeply rooted presumption against retroactive legislation,"

requiring that "courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *See Vartelas v. Holder*, 566 U.S. __, 132 S. Ct. 1479, 1483, 1486 (2012) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263 (1994)). The presumption against retroactive legislation is embedded in several provisions of the Constitution, "among them, the *Ex Post Facto* Clause, the Contract Clause, and the Fifth Amendment's Due Process Clause." *Id.* at 1486; *accord Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1127-29 (D.C. Cir. 1985) (warning against retroactive application of law given "the inherent repugnance of *ex post facto* imposition of civil liabilities").

To determine if a statute runs afoul of the retroactivity prohibition, we ask whether its provisions attach new legal consequences to events completed before its enactment. *Landgraf*, 511 U.S. at 269-70. That is, we look to see if the law "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002) (alterations in original) (internal quotation marks omitted). In looking for new legal consequences, material adjustments to the "*extent* of a party's liability" may suffice. *Landgraf*, 511 U.S. at 283-84. Not all retroactive application is out of bounds, however—*Landgraf* recognized that procedural rules "regulate secondary rather than primary conduct" and therefore raise no retroactivity concern. *Id.* at 275. Consequently, "[t]he critical question is whether a challenged rule establishes an interpretation that changes the legal landscape." *Nat'l Mining Ass'n*, 292 F.3d at 859 (internal quotation marks omitted).

We recently applied these principles in a case similar to the instant case. *See Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015). In *Koch*, an investment adviser petitioned our Court for

review of Commission penalties. *Id.* at 149-50. The Commission had sanctioned him for pre-Dodd-Frank trading violations by, *inter alia*, barring him from associating with the municipal advisor and NRSRO classes. *Id.* at 149-51. As noted earlier, however, *see supra* at 4-5, the Commission assumed the authority to ban a market participant from those two new classes only *after* the enactment of Dodd-Frank. *See Koch*, 793 F.3d at 157-58. Thus, the *Koch* Court considered a specific question: was "the Commission's order barring [the petitioner] from associating with municipal advisors or rating organizations . . . impermissibly retroactive[?]" *Id.* at 152.

We held that the bar was impermissibly retroactive. *Id.* at 157-58. In so holding, we stated that "by including *additional* associations from which one could be barred, the Act enhanced the penalties for a violation of the securities laws." *Id.* at 158 (emphasis in original). Following *Landgraf*, we found that "[a]pplying [Dodd-Frank] to [the petitioner] 'attache[d] new legal consequences' to his conduct by adding to the industries with which [the petitioner] may not associate." *Id.* (fourth alteration in original). Because the Congress did not expressly authorize retrospective application of Dodd-Frank, *see id.* at 157-58, we vacated the portion of the Commission order that applied Dodd-Frank's broader sanctions to Koch's pre-Dodd-Frank misconduct, *see id.*

Here, Bartko had no cognizable association with the investment adviser, municipal securities dealer or transfer agent classes when his misconduct occurred.[5] Nonetheless, the Commission has again attempted to retroactively apply

---

[5] The Commission originally charged Bartko as an investment adviser as well as a broker-dealer but it later determined that the "public record [did] not indicate that Bartko was associated with a registered investment adviser during the relevant period."

Dodd-Frank to bar Bartko from the investment adviser, municipal securities dealer and transfer agent classes. Thus, as we did in *Koch*, we conclude that the Commission's use of Dodd-Frank's collateral bar against Bartko constitutes an impermissibly retroactive penalty. The application of post-Dodd-Frank penalties to pre-Dodd-Frank misconduct constitutes a quintessential example of "attach[ing] new legal consequences to events completed before [Dodd-Frank's] enactment." *Vartelas*, 132 S. Ct. at 1491 (internal quotation marks omitted).

The Commission's attempt to avoid this conclusion is unpersuasive. It primarily rests on its claim that *Koch* already decided the issue before us. Resp't's Br. 29-33. According to the Commission's reading, *Koch* implicitly allowed the retroactive application of a collateral bar on the broker-dealer, investment adviser, municipal securities dealer and transfer agent classes notwithstanding the fact that, at the same time, it explicitly prohibited the Commission from extending that bar to the newly regulated municipal advisor and NRSRO classes.[6] *See id.* To support its reading, the Commission believes *Koch* held that the "limited" collateral bar—that is, the broker-dealer, investment adviser, municipal securities dealer and transfer agent prohibitions—constituted a mere *procedural* change and therefore did not run afoul of the retroactivity prohibition. *Id.* at 29. The Commission misreads *Koch*.

*Koch* addressed only one issue related to this case: whether the Commission order barring Koch from associating "*with municipal advisors or rating organizations*" was impermissibly retroactive. *Koch*, 793 F.3d at 152 (emphasis

---

[6] After *Koch* issued, the Commission acknowledged that the bar on the municipal advisor and NRSRO classes should be vacated. *See* Commission's Rule 28(j) Letter at 1-2 (Sept. 2, 2015).

added). We held that it was and went no further. *See id.* at 157-58.  In fact, we expressly stated that our holding did "not apply to the other securities industries with which Koch may not associate," *id.* at 158—that broader issue was neither before nor considered by the Court.[7]

---

[7] Based on an over-reading of Koch's reply brief, the Commission claims that Koch timely made the argument that Bartko now makes. Resp't's Br. 32. But Koch's opening brief failed to expressly raise the issue, referencing the retroactivity issue in only the most general terms. Corrected Brief for Petitioner at 53, *Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015) (No. 14-1134) ("The SEC's determination . . . to retroactively apply a collateral bar, which Congress added to the securities laws in 2010, to conduct that occurred in 2009 is impermissible as a matter of law. It is beyond dispute that sanctions cannot be applied retroactively."). It contained no discussion of the six market participant classes, no discussion of *Teicher*'s class-specific nexus and no discussion of the procedural and substantive effects of a retroactive application of Dodd-Frank. *Id.* at 53-54. It failed to clarify whether Koch was attempting to challenge the Commission's imposition of multiple bars in a single, omnibus proceeding, its debarment of Koch from classes with which he had not tried to associate or its debarment of Koch from the two classes it could not regulate before Dodd-Frank (*i.e.*, the municipal advisor and NRSRO classes). *See id.* "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008). Although Koch's reply brief came closer to raising the point Bartko raises, *see* Reply Brief for Petitioner at 25, *Koch v. SEC*, 793 F.3d 147 (D.C. Cir. 2015) (No. 14-1134) ("Previously, the SEC could not just bring proceeding after proceeding to impose multiple bars until they added up to the collateral bar it seeks to impose on Mr. Koch. Rather, the SEC could only bring another action seeking an additional bar as a remedy after 'the violator attempted to associate in a different capacity.'"), an argument first made in a reply brief is forfeited, *see Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

Footnote three of the *Koch* decision—on which the Commission heavily relies—is not inconsistent with this analysis. *Id.* at 157 n.3. Footnote three reads in full:

> Koch also argues that applying the Dodd-Frank Act to him is impermissibly retroactive because it changed the Commission's procedures for imposing sanctions. It is true that under the Act, the SEC may bar Koch from associating with all industries in the securities market in one proceeding, whereas before the Act the Commission had to initiate "follow-on proceeding[s]" for separate industries in the securities market. This change in procedure, however, does not give rise to retroactivity concerns.

*Id.* (alteration in original) (internal citations omitted). Plainly, footnote three focuses on "the Commission's *procedures* for imposing sanctions," adding that under Dodd-Frank, "the SEC may bar [a participant] from associating with all industries in the securities market in one *proceeding*, whereas before the Act the Commission had to initiate follow-on *proceeding*[*s*]." *Id.* (emphases added). Stated differently, to the extent the Commission was required *pre*-Dodd-Frank to bring separate follow-on proceedings to bar a market participant from each class he was associated with, Dodd-Frank changed that procedure, instead allowing for one omnibus proceeding at the end of which the Commission could ban a participant from *all* classes he was associated with. Consolidating separate proceedings into one omnibus proceeding, however, is a procedural change that raises no retroactivity concern. *See Landgraf*, 511 U.S. at 275 ("Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise

to the suit does not make application of the rule at trial retroactive.").

To repeat, *Koch* does not go further. Although *Koch* permits consolidation of *pending* proceedings, it says nothing about endorsing a collateral bar aimed at classes a market participant is neither associated with nor has sought to become so. Whereas the former is a procedural—and therefore permissibly retroactive—change, the latter has undeniable impermissibly retroactive ramifications. *See Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (outlining Supreme Court's "commonsense" and "functional" approach to retroactivity). For example, the imposition of a collateral bar significantly diminishes the possibility that a market participant will be able to associate with new classes regardless of the extent of his subsequent rehabilitation. Before Dodd-Frank, the Commission had to establish that a ban on each class was in the public interest, a task it often accomplished by considering the *Steadman* factors.[8] *See Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd*, 450 U.S. 91 (1981). In addition, the Commission had to show that the market participant had been, *inter alia*, convicted of a specified offense within the last ten years or enjoined from working in the industry *and* that the market participant was associated with—or seeking to become associated with—each class from which debarment was sought. 15 U.S.C. §§ 78*o*, 78*o*-4, 78q-1, 80b-3 (2000). Although the Commission could ban a market participant from, for example, the broker-dealer class at "$T_0$," it had to wait

---

[8] The *Steadman* factors include "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Steadman*, 603 F.2d at 1140.

until "$T_1$"—the point at which the market participant sought to associate with a new class—before imposing a ban covering that class. *See Teicher*, 177 F.3d at 1016. Moreover, even at $T_1$, the burden remained on *the Commission* to show that the broader ban was also in the public interest. *See* 15 U.S.C. §§ 78*o*(b)(6)(A), 78*o*-4(c)(4), 78q-1(c)(4)(C), 80b-3(f) (2000). If a market participant was sufficiently rehabilitated by $T_1$ that applying the *Steadman* factors made the broader ban contrary to the public interest, the Commission could not prevent him from associating with that second class.

Dodd-Frank changed this landscape. Now, the Commission may impose a collateral bar covering each class during an omnibus proceeding at $T_0$. *See* 124 Stat. at 1850-51. In effect, then, Dodd-Frank changed *when* the Commission must apply a *Steadman* analysis to determine whether it is in the public interest to bar a market participant from classes that he was not associated with at $T_0$—whereas before Dodd-Frank, the Commission was required to wait until $T_1$ before making that determination (a delay that required the Commission to take into account any intervening rehabilitation that may have occurred since $T_0$), the Commission may now use its $T_0$ public interest analysis to bar the participant from those additional classes in the first proceeding. This frontloading deprives the participant of the ability to avoid a broader ban at $T_1$ by undergoing "*Steadman* rehabilitation" after $T_0$. Moreover, Dodd-Frank's enactment also switches the burden of persuasion. After Dodd-Frank, it is the responsibility of the market participant (not the Commission) to show at $T_1$ that reinstatement to (rather than debarment from) a given class "would be consistent with the public interest," 17 C.F.R. § 201.193, a burden that even a wholly rehabilitated offender might struggle to establish. Collectively, these changes constitute a "new legal consequence[]" that cannot fairly be characterized as procedural. *See Lindh v. Murphy*, 521 U.S.

320, 327 (1997) ("[C]hange [to] standards of proof and persuasion . . . goes beyond 'mere' procedure to affect substantive entitlement to relief."); *Landgraf*, 511 U.S. at 270, 275.

Accordingly, we conclude that the Commission abused its discretion in barring Bartko from associating with the investment adviser, municipal securities dealer and transfer agent classes because those bars are impermissibly retroactive. *See* 5 U.S.C. § 706(2)(a); *Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995) (decision-maker "abuses its discretion if it did not apply the correct legal standard" or "if it misapprehended the underlying substantive law"(internal quotation marks omitted)).

### B. Unclean Hands

Bartko also claims that the Commission erred in failing to consider, or allow discovery regarding, his unclean hands defense. In light of government misconduct affecting both the Commission investigation of Bartko [9] and his subsequent criminal prosecution, Bartko suggests that equitable principles should estop the Commission from using his conviction as the basis for a follow-on proceeding. *See* Pet'r Br. 48. That is, Bartko argues that unclean hands is a "viable defense" to the follow-on proceeding. *Id.* We disagree.

Generally speaking, the unclean hands doctrine requires that a party seeking equitable relief "show that his or her conduct has been fair, equitable, and honest as to the particular controversy in issue." 27A AM. JUR. 2d *Equity* § 98 (Nov.

---

[9] As noted earlier, *see supra* at 6-7, Bartko insisted that he provided information to Commission investigators only to aid their investigation of Hollenbeck. Joint Appendix 5-7, 211-16.

2016). If a plaintiff does not act "fairly and without fraud or deceit," the unclean hands doctrine affords a defendant a complete defense. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945). Ultimately, the unclean hands doctrine rests on the principle that "he who comes into equity must come with clean hands." *Shondel v. McDermott*, 775 F.2d 859, 867-68 (7th Cir. 1985).

The application of the unclean hands doctrine to the government, however, is far from categorical. Although the Supreme Court has left open the question of whether there exists a "flat rule that [unclean hands] may not in any circumstances run against the Government," it has nonetheless recognized that "the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984). The government receives this special treatment based on the notion that "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.*; *accord SEC v. Gulf & W. Indus.*, 502 F. Supp. 343, 348 (D.D.C. 1980) (denying unclean hands defense "because it may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest"). Nevertheless, *Heckler* suggests that the unclean hands doctrine may apply where "the public interest in ensuring that the Government can enforce the law free from estoppel [is] outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler*, 467 U.S. at 60–61. "Where courts have permitted equitable defenses to be raised against the government, they have required that the agency's misconduct be egregious and the resulting prejudice to the defendant rise to a constitutional

level." *SEC v. Elecs. Warehouse, Inc*., 689 F. Supp. 53, 73 (D. Conn. 1988), *aff'd*, 891 F.2d 457 (2d Cir. 1989).

Bartko's case does not fit within the narrow window outlined in *Heckler* and *Electronics Warehouse*. The Fourth Circuit expressly held that any prejudice stemming from the government's misconduct during Bartko's investigation and prosecution failed to rise to a constitutional level. *Bartko*, 728 F.3d at 331-32, 342 ("[O]ur the jury's conviction of Bartko was not undermined by the government's misconduct in this case."). Nothing in the record casts doubt on that conclusion. Moreover, underscoring Bartko's failure to meet *Heckler*'s and *Electronics Warehouse*'s threshold requirement is the Commission's finding that Bartko demonstrated "a fundamental lack of commitment to investor protection principles" and that there existed a "risk that he would engage in similar conduct if presented with future opportunities." Joint Appendix 371-72. Here, then, "the public interest in ensuring that the Government can enforce the law free from estoppel" is significant. *See Heckler*, 467 U.S. at 60–61.

For the foregoing reasons, the portion of Bartko's petition that challenges the investment adviser, municipal securities dealer and transfer agent bar is granted.[10] The remainder of Bartko's petition is denied.

*So ordered.*

---

[10] In accordance with the SEC's concession, *see supra* at 12 n.6, the portion of Bartko's petition challenging the municipal advisor and NRSRO bars is also granted.